1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT FOR THE

7                         EASTERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES OF AMERICA,      )         No. CR-F-95-5287 OWW
                                    )
10                                  )         ORDER DENYING MOTION FOR NEW
                                    )         TRIAL FILED BY DEFENDANT
11                   Plaintiff,     )         (Docs. 494-495)
                                    )
12            vs.                   )
                                    )
13                                  )
    TIMOTHY WAYNE ARNETT,           )
14                                  )
                                    )
15                   Defendant.     )
                                    )
16  _____)

17       Defendant, Timothy Arnett, proceeding in pro per, has filed

18  a motion for a new trial pursuant to Rule 33, Federal Rules of

19  Criminal Procedure, on the ground that he was denied provision of

20  copies of the transcripts of his prior trial in this court in

21  1998.[1]

22       This motion is DENIED.  The reasons stated herein are

23  intended to incorporate and amplify the reasons for denying this

24  _____

25       [1]Arnett concedes that he was provided the transcripts from his
    1996 trial in the District of Oregon by Assistant Federal Defender
26  Robert Rainwater on March 3, 2005.

                                    1

1  motion stated in open court on July 6, 2006.

2

3       **A.   Background**.

4       On December 12, 2004, Judge Coyle, the previously assigned

5  judge, granted Arnett's oral request to appoint a legal

6  representative to assist Arnett in the mechanics of preparing for

7  trial and ordered the Federal Defender's Office to appoint stand-

8  by counsel for this purpose (Doc. 339).  Assistant Federal

9  Defender Rainwater was so appointed.

10      On January 5, 2005, Arnett filed a motion for discovery

11  (Doc. 342), which motion was noticed for hearing before Judge

12  Coyle on February 7, 2005.  In this discovery motion, Arnett

13  requested pretrial discovery of "[p]rior transcripts of

14  defendant's trials in the District of Oregon and in the Eastern

15  District of California."  In its response to the discovery motion

16  filed on January 20, 2005, the United States responded to this

17  request as follows: "The defendant already has the transcripts

18  from his prior trials in this district and Oregon as evidenced by

19  the many appeals he has filed in the Ninth Circuit.  The

20  government objects to killing more trees for no reason." (Doc.

21  345).  At the hearing on Arnett's discovery motion on February 7,

22  2005, the following occurred:

23          THE COURT: All right.  Now, on your motion
            for discovery.
24
            MR. ARNETT: Yes, Your Honor.  I filed a
25          motion for discovery and I received a letter
            from Mr. Rice that I'd like to submit to the
26          Court if I may.

2

1          ...

2          THE COURT: Is it something you want to file?

3          MR. ARNETT: Yes.

4          THE COURT: The Court doesn't accept filings.

5          ...

6          MR. RICE: Can I have one second?  What is it,
           Tim?
7
           MR. ARNETT: It's the letter that -
8
           MR. RICE: Oh, the discovery thing.  Basically
9          all it is, Your Honor, it's a letter of
           January the 20th.  What I'm doing is I'm
10         providing a copy of the original discovery in
           the case to Mr. Rainwater, his advisory
11         counsel, so he'll have it.  Mr. Rainwater
           requested that as well.  That's all that
12         letter is.  Our standard discovery letter.

13         MR. ARNETT: Right, Your Honor.  My point
           being was that Mr. Rice served a copy of the
14         discovery on Mr. Rainwater, but not myself.
           Now, I guess after Mr. Rainwater read the
15         discovery or whatever he's done with it, he
           turned around and sent me a copy and I
16         received it Friday.  I haven't had a chance
           to go through it.  So bottom line, what I'm
17         trying to say here, Your Honor, is that I'm
           not prepared at this time to submit the
18         matter to the Court because I haven't had a
           chance to review what's he's given me.
19
           ...
20
           THE COURT: All right.  Mr. Rainwater, did you
21         get a copy of that discovery?

22         MR. RAINWATER: Yes, I did.  And I had a copy
           sent to Mr. Arnett.  It takes some time
23         through the jail to get there.

24         ...

25         MR. ARNETT: What I'm asking for ... today is
           a continuance until February 28th on this
26         matter, on the discovery, so I have a chance

                              3

1   to go through it, discuss it with Mr.
    Rainwater.
2
    THE COURT: All right.  Then the matter will
3   be continued to February 28th.  Any responses
    will be filed on or before February 14th and
4   the government's response by February 22nd.
    The matter is set for February 28th at 9:00
5   a.m.

6   And let's see what else we had.  If there's
    anything else we can resolve.  You asked this
7   court for transcripts of the prior trials.
    Has [sic] the United States respond it's
8   quite obvious you already have copies of
    those transcripts and the –
9
    MR. ARNETT: Your Honor, the -
10
    THE COURT: Court sees no reason to go through
11  the taxpayers expense of producing all these
    transcripts of your prior trials once again.
12
    MR. ARNETT: On that matter, Your Honor,
13  that's quite true.  I do have the set of
    transcripts and it's in my property at United
14  States Penitentiary in Victorville.  I don't
    have the luxury of bringing my entire office
15  with me like Mr. Rice has.  They grabbed me
    out of the hole there at Victorville and
16  brought me here, so what little bit I was
    able to bring with me is very sparse and I
17  don't have the transcripts.

18  THE COURT: All right.  Anything further?

19  MR. ARNETT: No, Your Honor.

20  THE COURT: Matter will be taken under
    submission.  Anything further, Mr. Rice?
21
    MR. RICE: No, Your Honor.
22
    THE COURT: Mr. Rainwater?
23
    MR. RAINWATER: Well, just on the last matter.
24  I have obtained the transcripts and I've told
    Mr. Arnett that anything he wants, just let
25  the investigator know that I've assigned to
    him know and we'll get them to him.
26

4

1        THE COURT: All right.  That resolves that
         issue then.
2
    Although Arnett filed another discovery motion and reply to the
3
    United States' opposition to his initial motion on February 17,
4
    2005 (Doc. 354), Arnett does not discuss the provision of trial
5
    transcripts in this pleading.  At the hearing on February 28,
6
    2005, the following occurred:
7
         THE COURT: ... Defendant asked for copies of
8        the transcripts.  It's my understanding that
         the clerk - that the defendant has copies of
9        the previous trials, transcripts of previous
         trials.
10
         MR. ARNETT: They're in my property at the
11       penitentiary.
12       ...
13       THE COURT: And they've not been furnished to
         you?
14
         MR. ARNETT: No, they haven't.
15
         THE COURT: All right.  Mr. Rainwater, is
16       there any attempt to have them sent to him?
17       MR. RAINWATER: Yes.  We have - I have a
         transcript and I indicated last time I was
18       here, I'm glad to provide whatever he wants.
         We don't have the transcripts of the Oregon
19       file yet, but we should have them in a week.
20       THE COURT: It was the Court's understanding
         that he did have the Oregon transcripts.  Is
21       that not correct?
22       MR. RAINWATER: No, I'm sorry.  We have the
         transcript of the trial here.
23
         THE COURT: The Oregon trial?
24
         MR. RAINWATER: No, the trial that occurred in
25       this court.  As to the Oregon trial, we tried
         to get it through his defense counsel up
26       there.  He couldn't find the file.  It didn't

                              5

1          come back from the Ninth Circuit until last
week, my understanding, and they're getting

2          it to us - the file didn't come back from the
Ninth Circuit last week, they're supposed to

3          get it this week.

4          THE COURT: All right.  So it's on the way?

5          MR. RAINWATER: Yes.

6 As noted, Arnett concedes that Mr. Rainwater provided him a copy

7 of the transcript of the trial in the District of Oregon on March

8 3, 2005.   On March 4, 2005, Judge Coyle filed an Order Denying

9 Defendant's Motion for Discovery (Doc. 357), wherein Judge Coyle

10 ruled in pertinent part:

11          ... Furthermore, defendant has copies of the
transcripts of the previous trials in this

12          court and in the District of Oregon.
Consequently, he is able to review those

13          testimony of those transcripts [sic].

14          ...

15          The court is advised by Mr. Rainwater that
the transcripts of defendant's trial in

16          Oregon will be obtained by Mr. Rainwater
within the week.  Therefore, this request is

17          denied.

18 On March 4, 2005, Arnett filed a Motion Requesting New Stand-By

19 Counsel (Doc. 358).  This motion was heard on March 14, 2005 and

20 taken under submission.  On March 18, 2005, Judge Coyle filed an

21 order under seal (Doc. 367) denying Arnett's motion for new

22 advisory counsel.  However, nowhere in Arnett's motion or during

23 the hearing before Judge Coyle does Arnett indicate that he had

24 not received the transcripts from the trial in this court from

25

26

1  Mr. Rainwater.[2]  This action was transferred for trialfrom the

2  docket of Judge Coyle to the docket of Judge Wanger on April 20,

3  2005 (Doc. 384).  The existing trial date in of June 1,  2005,

4  was

5  continued to August 2005, at Arnett's request to permit

6  additional time for investigation and appointment of an

7  asdditional firearms expert to assist Arnett. At no time

8  following the transfer of this action did Arnett raise in any

9  proceeding or move for provision of the trial transcripts from

10  the trial in this court or advise Judge Wanger that he had not

11  received all trial transcripts from Mr. Rainwater.  Mr.

12  Rainwater's oral representations to Judge Coyle were that Mr.

13  Rainwater had copies of the transcripts of the trial in this

14  court and would provide them to Arnett.  Furthermore, Arnett

15  never sought an order directing the federal prison at Victorville

16  to provide Arnett with his copy of the prior trial transcript

17  until the motion filed on March 3, 2006, seven months after his

18  conviction, which motion was granted by Order filed on March 21,

19  2006.  (Doc. 562).

20      In his declaration in support of the Motion for a New Trial

21

---

22      [2]In the Order, (Doc. 367), denying Arnett's motion for new
    stand-by counsel, Judge Coyle recognized that the use of the term
23  "stand-by counsel" was incorrect and that the term "advisory
    counsel" should have been used to describe the assistance to be
24  provided by Mr. Rainwater to Arnett.  Thereafter, the Federal
    Defender's Office declined appointment as advisory counsel for
25  Arnett (Doc. 374) and by Order filed on March 29, 2005 (Doc. 377),
    Judge Coyle relieved the Federal Defender's Office as advisory
26  counsel to advise Arnett in the mechanics of trial preparation.

filed on August 16, 2005 (Doc. 495), Arnett avers in pertinent part:

> ...
>
> (3) On March 3, 2005, standby counsel, Robert Rainwater, mailed me a complete copy of the trial transcripts from my prior trial in the District of Oregon, Case No. CR-F-95-60012 MRH ... I had not solicited the transcript from him.  Mr. Rainwater did not send me a copy of my prior trial transcript from the Eastern District of California.  Shortly thereafter, the Federal Defenders Office moved to withdraw their services.  Judge Coyle granted their motion and Rainwater was permitted to withdraw;
>
> (4) I did not have a copy of prior trial transcript from the Eastern District of California in my possession at the Fresno County Jail to adequately prepare for retrial; and
>
> (5) My copy of the prior trial transcript from the Eastern District of California is in my personal and legal property at the United States Penitentiary in Victorville, California, where I was incarcerated prior to being transported back to Fresno for retrial.

After the United States noted in its initial opposition to this motion for new trial that Arnett had attached copies of the first trial transcript to motions and, therefore, must have had a copy, Arnett filed a declaration on January 18, 2006,  (Doc. 531), wherein he avers in pertinent part:

> ...
>
> (2) I did not have a copy of my prior trial transcript in the Eastern District of California from 1998 in my jail cell in the Fresno County Jail prior to my second trial in August of 2005;
>
> (3) The portion of my prior trial transcript

8

that was included in my motion to suppress
came from an earlier new trial motion
submitted by defense counsel Kevin Little in
1998.  Kevin Little's prior motion was
acquired for me by Federal Defender
Investigator Pat Fager from the District
Court's official case file at my request;

(4) Assistant Federal Defender, Robert
Rainwater, only sent me a copy of my prior
trial transcript from the District of Oregon
in 1996, and not the transcript from my first
trial in the Eastern District of California
....

(5) I asked Richard Barnes to get permission
from the Fresno County Jail's authority to
search my cell to confirm that I did not have
a copy of the trial transcript from my first
trial;

(6) I also asked Fresno County Jail Corporal
Townsend to allow Richard Barnes to search my
cell for the trial transcript, and if not,
would he?  Townsend replied that Barnes could
not search my cell and he would not either;

(7) During trial in August of 2005, Richard
Barnes set at the table with me.  We
discussed the fact that I did not have the
prior trial transcript to prepare for trial,
and he heard me comment to him that I was
just going to have to wing it using the FBI
and police reports in discovery that were
given to me just days before trial.  Barnes
witnessed what I used to cross-examine the
witnesses and he heard first hand that the
only trial transcript I had and used during
trial was the transcript from the District of
Oregon.  The transcript of the second trial
bares [sic] point out because I specifically
made reference to and asked Burrows and
Vorisek about their prior testimony in the
District of Oregon, and referred to the
transcript pages.  There is no other record
from the second trial where I used any
specific reference from a prior trial
transcript from the Eastern District of
California;

(8) I recently received a copy of my 1998

9

1
2
3
4
5
6

trial transcript from Court Reporter Karen
Lopez when I used a Transcript Order form in
connection with a civil appeal to the Ninth
Circuit court of appeals;

(9) Prior to receiving this copy of the
transcript, the only other copy I have ever
had is in my personal possession in the
United States Penitentiary in Victorville,
California, where I came from for retrial
....

7  Mr. Barnes, in a declaration executed on April 13, 2006, avers

8  that USP Victorville mailed to him three boxes of Arnett's

9  property in early April, 2006 and that Mr. Barnes "located two

10 bound volumes of REPORTER'S TRANSCRIPT OF PROCEEDINGS related to

11 motions and Arnett's jury trial that was held on March 2, 1998,

12 March 3, 1998 and March 4, 1998."   Mr. Barnes, in a declaration

13 executed on April 17, 2006, avers that, attached to the motion

14 for a new trial filed by Kevin Little on behalf of Arnett on June

15 12, 1998 are trial transcript pages 84, 87, 88, 97, 111, 112 and

16 193.

17     At the hearing on July 6, 2006, Arnett stated that he made

18 it known that he had not received the trial transcripts at a

19 hearing on August 2, 2005, the day before the jury trial of the

20 Section 924(c) counts commenced.

21     An evidentiary hearing had been scheduled for August 2, 2005

22 in connection with Arnett's motion to suppress his 1995

23 confession to Medford Police detectives Roy Skinner and Terry

24 Newell on the ground that they destroyed, in bad faith, the

25 extensive interview notes they took before defendant confessed to

26 the California bank robberies on tape and on the ground that

1   Arnett's then-existing mental condition prevented his confession

2   from being knowing and voluntary.  Arnett withdrew this motion in

3   open court on August 2, 2005.  The following then occurred at the

4   August 2, 2005 hearing:

> MR. ARNETT: Thank you, Your Honor.  First of all, I wanted to talk about the lack of disclosure of discovery in this case. Initially, in - on January 20th of this year, Mr. Rice disclosed Bates numbers 1 through 519 to Mr. Rainwater and then Mr. Rainwater forwarded it on to me.  After that time, I wrote back to Mr. Rice and I told him that there was a bunch of things missing. Obviously I had seen this discovery once before and there were a whole bunch of various reports, all the key witness reports were missing, various things I asked him to disclose.  No response.
>
> Then finally, when Mr. Barnes was appointed, I asked him to ask Mr. Rice.  He did.  And his response was it's all there.  Just it's out of order.  The numbers are mixed up and so forth.  Just, you know, go through it, it's all there.
>
> Then last week, here comes all of the key reports for every single witness that's going to testify in this trial.  The discovery I had had nothing in it, it was a bunch of reports for people that aren't going to testify.
>
> And if I may read his letter, it's real short.  This is dated July 22nd. 'Greetings. Enclosed are tapes of redacted interview and interview [sic] that you requested.  Also enclosed are copies of victim tellers' interview reports that I found yesterday in my trial notebook for the first trial.  I can't remember if I pulled these from my discovery binder and put them in my trial notebook or just made copies and put them in my trial notebook seven years ago.  In any event, I thought it best to go ahead and recopy them and send it to you.'

11

1    My point being here is I didn't have any of
     the relevant discovery that I needed to
2    prepare for trial on any of the witnesses
     that are going to testify until last week.
3    And I think Mr. Barnes can verify if need be.

4    MR. RICE: What nonsense.  He sat through the
     first trial seven years ago where all the
5    victim tellers testified.  He's had the
     transcript from all those victim tellers.
6    What happened was I had a binder where there
     were the - when I prepared for trial the last
7    time, I interspaced in there the FDIC
     packets, things like that in there.  The
8    Bates stamps ran from 1 to 519, but those
     other things were spaced in and he had copies
9    of all of that.

10   The victim tellers police reports were the
     only things that were in my trial binder from
11   the first trial that I found on July the
     22nd.  When I found those, I made copies of
12   them and provided it to him.

13   I would respectfully submit that the volume
     of his pleadings kind of speaks for itself as
14   far as the extent of discovery provided in
     this case.
15
     THE COURT: All right.  And in connection with
16   the 1998 trial in the Eastern District of
     California, what was the circumstance as to
17   the teller police reports?

18   MR. RICE: They were all provided.

19   THE COURT: In discovery?

20   MR. RICE: Yes.  The stuff that was provided
     to Mr. Rainwater was done as a courtesy to
21   Mr. Rainwater.

22   THE COURT: And how may tellers will there be
     testifying in this trial?
23
     MR. RICE: I expect there to be 19.  There are
24   23 tellers subpoenaed.  I expect to call 19.

25   THE COURT: And how many tellers testified in
     the first trial?
26

                            12

1    MR. RICE: 23.  I'll call 19 of the 23 I
     called the first time.  But he's already
2    heard from all these people.

3    THE COURT: All right.  So there will be no
     teller called to testify in this trial who
4    has not already testified about these alleged
     crimes in this case?
5
     MR. RICE: Correct.
6
     THE COURT: And with regard to the reports
7    that have been described as police reports,
     any statements that the tellers had made
8    before their testimony in court were
     contained in those reports?
9
     MR. RICE: Correct.
10
     THE COURT: Were there any independent
11   statements not contained in the reports?

12   MR. RICE: No, Your Honor.  Their testimony
     from the trial was additional to those
13   reports, but he was there and heard it and he
     also had the transcripts.
14
     ...
15
     THE COURT: All right.  Is there anything
16   further that you wish to offer on this issue,
     Mr. Arnett?
17
     MR. ARNETT: Yes, Your Honor.  As Mr. Rice
18   well knows, and I've stated this many times
     and in Judge Coyle's court, just because I've
19   had these particular reports, transcripts,
     whatnot, at one time and I do admit that.
20   And I do have these in my possession in my
     property at the United States Penitentiary in
21   Victorville does not mean that I have these
     items with me now.  They don't allow me to
22   bring my files, boxes.  I think I had like
     seven big boxes of legal papers, transcripts,
23   whatnot there.  And obviously, they're not
     going to bring those with me.
24
     So they represent the fact, that 'he had
25   them.'  Yeah, I had them, but the question is
     does Mr. Arnett, the defendant, representing
26   himself, have them here today?  And had them

                        13

1        prior to this trial.

2        THE COURT: And as I understand it, since the
         - was it the 26th of July?
3
         MR. RICE: 22nd.
4
         THE COURT: The 27th of July?
5
         MR. RICE: The 22nd of July is when I found
6        the police reports only for the victim
         tellers in my first trial notebook, from the
7        first trial.  I found those in there.  So I
         made copies of those and sent them to him.
8        He had everything else already, long ago,
         that I sent to Mr. Rainwater.
9
         THE COURT: All right.  Is the matter
10       submitted?

11       MR. ARNETT: One last thing, Your Honor.  He's
         right.  I had the rest of it, but the rest of
12       it's irrelevant.  We're talking about reports
         from people that aren't going to testify.
13       You know, what's - what is that going to do?
         So submitted.
14
         THE COURT: Thank you.  I am going to find
15       that the furnishing of these reports on or
         about July 22nd, 2005 in this case, that are
16       described as Oregon police reports that
         relate to percipient witness tellers, they've
17       all been characterized as, has caused no
         prejudice to the defendant.
18
         The defendant has had these reports in his
19       possession.  He's had an opportunity over at
         least seven years to review them.  He heard
20       every one of these tellers testify in the
         first trial in this court.  He has had, as to
21       each of these witnesses, the reports in his
         possession for at least ten days prior to the
22       commencement of the trial.

23       Even if we were applying the *Jencks* Act, he
         would not be necessarily entitled to witness
24       statements in the underlying information
         until after the direct examination of the
25       witnesses.

26       However, he's had the reports, he's had the

                            14

background, he's had all the investigative
data that pertains to those witnesses for at
least seven years.  And has heard each of the
witnesses testify.

As a result, I find that there is no failure
to comply by the government with their duty
of disclosure or any obligations under Rule
16.  I find that the defendant has suffered
no prejudice and that he is adequately
prepared and adequately qualified to deal
with these witnesses in the context of the
upcoming trial. [CT 9-15]

In his "Notice and Defendant's Additional Declarations and

Documents in Support of His *Pro Se* Motion for a New Trial (Doc.

#494)" filed on April 28, 2006, (Doc. 568), Arnett asserts:

"Defendant never asked Rainwater to give him a copy of any prior

trial transcripts because it was the government's

responsibility."  At the hearing on July 6, 2006, Arnett

asserted:

THE DEFENDANT: I didn't have the transcript
with me.  Rainwater and I did not get along
at all as you can tell from my motion for
substitution of counsel.  Him and I were
really at each other.  We didn't communicate.
He knew in the courtroom that I didn't have
the trial transcript.  I asked for it on
those two different occasions that you
mentioned in February.  I didn't need to go
to beg him later on, after court, and say,
hey, send me a copy of this trial transcript.
He knew better.  He knew I wanted it.  And I
didn't feel like trying to talk to him about
anything else.  Him and I were really butting
heads.  As a matter of fact, one day after
that I filed a motion for substitution of
counsel after the 28th of February.  And so
then we had the hearings on that and he went
down the road and so did Pat Fager and
everybody left.  I was not getting along with
him.  So feeling like that, as I did, I
wasn't about to call him up and beg him to
give me something that he already knew I

15

1    wanted and that I didn't have.

2    THE COURT:   Well, what was the finding that
     I made about the transcript?
3
4    THE DEFENDANT: I don't - that I didn't have
     it or did have it?  Did you make a finding?

5    THE COURT: Well, you referred to a transcript
     that I don't have.  Of August 2nd.
6
7    THE DEFENDANT: I'm talking about the Fresno
     transcript.  He sent me the Oregon
     transcript.  But he never sent me the Fresno
8    transcript.

9    THE COURT: Well, he told us that he had the
     Fresno transcript.
10
11   THE DEFENDANT: Right.  But he never sent it
     to me.  That's right.  And him and I are not
     talking.  We're not communicating.  We're
12   yelling and cussing at each other in the
     attorney room.  And he knows in the courtroom
13   that I don't want - that I need this.  I want
     it.  And, what -
14
15   THE COURT: What does this August 2nd
     transcript of proceedings before me say about
     the transcript -
16
17   THE DEFENDANT: You never commented on it.  It
     just - just no, no, no, no, we're going to
     trial, that's all there is to it.  And we're
18   going to trial.

19   **B.   Merits of Motion**.

20       In moving for a new trial on the ground that he was not

21   provided with the transcripts of the prior trial in this court,

22   Arnett relies on *Britt v. North Carolina*, 404 U.S. 226, 227

23   (1971): "[T]he State must, as a matter of equal protection,

24   provide indigent prisoners with the basic tools of an adequate

25   defense or appeal, when those tools are available for a price to

26   other prisoners."  *Britt* held that the state is ordinarily

16

required to provide an indigent defendant with the transcript of the proceedings of a prior mistrial in order to aid him in preparing his defense." *Id*. at 227-228.  In *Kennedy v. Lockyer*, 379 F.3d 1041, 1053 (9th Cir. 2004), *cert. denied*, 544 U.S. 992 (2005), the Ninth Circuit stated that "[w]here the state completely fails to provide an indigent defendant with a transcript of a mistrial for use in connection with a second trial, we would likely find a structural error, requiring automatic reversal."

Arnett was provided with the transcript of his prior trial in the Eastern District of California.  As early as March 2005, Mr. Rainwater, Arnett's advisory counsel told Arnett in open court that Mr. Rainwater was then in possession of that trial transcript.  Mr. Arnett apparently did not ask Mr. Rainwater to provide Arnett with the trial transcript.  At no time From March through the trial in August 2005, did Arnett ask Mr. Barnes, Mr. Rainwater, Ms. Fager, the Court, or anyone else to have the trial transcript delivered to the jail from Mr. Rainwater's office, although Mr. Rainwater had twice offered to do so in open court on February 5 and 20, 2005, as reflected by the hearing transcripts.  Arnett, recognizing the possibility that this motion for new trial may be denied because of his failure to advise the United States or the district court judges that he had not been provided with a copy of the prior trial transcript in discovery, asserts:

> [T]he government attempts to shift the

17

responsibility of providing the transcripts
on then standby counsel, Robert Rainwater,
when defendant had specifically requested in
two (2) discovery motions for the government
to disclose them.  Federal Rule 16 of
Criminal Procedure and well-established case
law requires the government to disclose a
copy to the defendant when requested, and not
someone else.

In its supplemental opposition to the motion for new trial
(Doc. 579), the United States notes that defendant had a copy of
the trial transcript at USP Victorville and contends that Arnett
had the "power and intention to control it".  In so contending,
the United States refers to Ninth Circuit Model Jury Instruction
3.18.  The United States argues that Arnett "simply chose not to
retrieve it prior to his second California trial in order to try
and create a ground for a motion for new trial."  Moreover, after
having been provided a transcript at government expense for the
Eastern District first trial, it was incumbent on Arnett to show
good cause why a second transcript should be provided him, when
he had the first transcript at Victorville and did not request it
be forwarded on February 5 or 20,2005, and a second copy of the
transcript was in Fresno at Mr. Rainwater's office and had twice
been offered to Mr. Arnett, who admits he made the choice not to
ask Mr. Rainwater for the trial transcript because Arnett did not
get along with Mr. Rainwater.  Judge Coyle reasonably understood
the trial transcript would be provided to Arnett because Mr.
Rainwater twice told Judge Coyle, he would provide Mr. Arnett the
trial transcript and Arnett has never stated that Mr. Rainwater
would not deliver the transcript to Arnett after February 5 and

18

1   20, 2005.

2       In addition, the United States argues, Arnett's decision not

3   to have the first California trial transcript with him at the

4   second California trial is invited error.In so arguing, the

5   United States refers to the hearings before Judge Coyle

6   concerning this issue quoted above.  In addition, the United

7   States refers to the fact that Arnett had the ability to utilize

8   the services of investigators Fager and Barnes prior to the

9   second trial.  Noting the representations made by Mr. Rainwater

10  that Mr. Rainwater had a copy of the trial transcript, the United

11  States contends that "[a]ll the defendant had to do was remind

12  Mr. Rainwater to give it to him, or have Ms. Fager or Mr. Barnes

13  get it from Mr. Rainwater for him."  The United States further

14  notes that Arnett's motion for new trial on this issue was

15  executed by Arnett on August 10, 2005, the same day he was

16  convicted in the second trial.  The United States asserts that

17  "if the defendant did not have the first California trial

18  transcript with him during the second trial, it was because he

19  chose not to have it with him in order to wrongfully manufacture

20  an issue."

21       "Under the invited-error doctrine, an error that is caused

22  by the actions of the complaining party will cause reversal 'only

23  in the most "exceptional situation."'" *United States v. Schaff*,

24  948 F.2d 501, 506 (9th Cir. 1991).  When invited error is

25  involved, the movant must "demonstrate that reversal is necessary

26  to preserve the integrity of the judicial process or to prevent a

miscarriage of justice."  *Id*.  In *United States v. Perez*, 116

F.3d 840 (9ᵗʰ Cir. 1997), the Ninth Circuit addressed the

viability of the invited error doctrine in the context of

erroneous jury instructions.  Referring to *United States v.*

*Olano*, 507 U.S. 725 (1993), where the Supreme Court provided a

framework for plain error review under Rule 52(b), Federal Rules

of Criminal Procedure, the Ninth Circuit held in pertinent part:

> ... Although *Olano* does not directly address
> so-called 'invited error,' it certainly
> addresses the difference between forfeited
> and waived rights ... Accordingly, we cannot
> agree that *Olano* completely overruled our
> invited error doctrine.  Instead, we must
> reformulate that doctrine to conform to
> *Olano*'s discussion of waiver and forfeiture.
>
> Forfeiture is the failure to make a timely
> assertion of a right, whereas waiver is the
> 'intentional relinquishment or abandonment of
> a known right.'  *Olano*, 507 U.S. at 733 ...
> Forfeited rights are reviewable for plain
> error, while waived rights are not.  *Id*.  'If
> a legal rule was violated during the District
> Court proceedings, and if the defendant did
> not waive the rule, then there has been an
> "error" within the meaning of Rule 52(b)
> despite the absence of a timely objection.'
> *Id*. at 733-34 ....
>
> Until now, our invited error doctrine has
> focused solely on whether the defendant
> induced or caused the error ... We recognize,
> however, that we must also consider whether
> the defendant intentionally relinquished or
> abandoned a known right.  *Olano*, 507 U.S. at
> 733.  If the defendant has both invited the
> error, and relinquished a known right, then
> the error is waived and therefore
> unreviewable.

116 F.3d at 845.

    Although the United States does not contest that it was

20

1  required to provide the transcript in discovery, the

2  representations by Mr. Rainwater to Judge Coyle were that the

3  transcript in Mr. Rainwater's possession would be provided by Mr.

4  Rainwater to Arnett.  Arnett never advised Judge Coyle, Judge

5  Wanger or the United States that Mr. Rainwater had not done so

6  until after the jury's verdict on August 10, 2006.  Arnett's

7  contention that he made known to Judge Wanger at the August 2,

8  2005 hearing that the transcripts had not been provided by Mr.

9  Rainwater is unpersuasive.  The transcript of the August 2, 2005

10 hearing quoted above establishes that Arnett was concerned about

11 the late provision to him of police reports of interviews with

12 the victim tellers.  While Arnett makes a brief and elliptical

13 reference to transcripts, he did not specifically advise that he

14 had not been given the transcripts of the prior trial in the

15 Eastern District contrary to Mr. Rainwater's representations.

16 Furthermore, even if Arnett's statement on August 2, 2005 can be

17 construed as a specific representation that Arnett had not been

18 provided the trial transcripts, such a representation on the eve

19 of trial is not timely.  Given the date of preparation and

20 signing of Arnett's motion for new trial, Arnett's failure to

21 advise either district court judge or the United States of this

22 alleged failure prior to the second trial was deliberate and

23 calculated.  Arnett's contrived inaction is also evidenced by his

24 failure to make any effort to obtain the copy of the trial

25 transcript included with his property at USP Victorville, wh ich

26 Mr. Barnes expeditiously accomplished, until months after his

1  conviction and the filing of the motion for new trial.  Absent a
2  concrete assertion by Arnett that he did not have a complete copy
3  of the trial transcript, neither the United States, Judge Coyle
4  or Judge Wanger could have understood that Mr. Rainwater did not
5  provide the copy and that Arnett did not have one as of August 2,
6  2005.  If Arnett had timely made such an assertion, either Judge
7  Coyle or Judge Wanger would have taken appropriate action.
8  Instead, on the eve of trial with some 25 witnesses from Oregon
9  subponaed to appear,  Arnett only provided an ambiguous statement
10  about the transcript in dispute.  While Arnett initially made a
11  timely assertion for the trial transcript through  motions for
12  discovery heard in February 2005, the record set forth above
13  persuasively establishes that Arnett's failure to advise the
14  United States, Judge Coyle or Judge Wanger that Mr. Rainwater had
15  not provided the trial transcripts in contradiction to the
16  representations made to Judge Coyle, or to ask either
17  investigator to get the transcriptfrom the federal defender's
18  office, or to obtain the transcript from USP Victorville, until
19  after the jury's verdict constitutes an intentional
20  relinquishment of a known right.  Therefore, under the analytical
21  framework set forth in *Perez*, Arnett invited the error.

22      A separate and independent ground exists to deny Arnett's
23  assertion that he was entitled to a second trial transcript at
24  government expense.  Under 28 U.S.C. section 753(f), a defendant
25  must show good cause for entitlement to a second transcript.
26  Henderson v. United States, 734 F.2d 483,484 (9th Cir. 1984) He

1  has not done so.

2       The United States further opposes this motion for new trial

3  on the ground that Arnett suffered no prejudice because of the

4  alleged failure to provide him with a copy of the trial

5  transcript of the first trial in the Eastern District of

6  California.  The United States notes that Arnett's defense in the

7  second trial in this court was that the shotgun used during the

8  course of the armed bank robberies was an antique.  No evidence

9  was submitted on that issue at the first trial because of the

10 application of collateral estoppel.  That age of the firearm

11 issue was litigated in the District of Oregon and, as Arnett

12 concedes, Mr. Rainwater provided him with and he had for the

13 third trial, a copy of the District of Oregon transcript.  The

14 United States refers to Arnett's opening statement in the second

15 California trial in which he raised only the affirmative defense

16 that the firearm at issue was an antique and to Arnett's closing

17 argument to the jury.  The United States further refers to

18 Arnett's closing argument, in which Arnett admitted that he had

19 committed the armed bank robberies:

20              [F]rom the testimony and evidence in this
                trial, you have heard that the defendant was
21              arrested on December 21st, 1995 and was
                subsequently charged with seven counts of
22              armed bank robbery after he confessed.  And
                that subsequently thereafter, he was tried,
23              convicted, of multiple counts of armed bank
                robbery, including multiple counts of
24              enhancements for using a firearm during the
                robberies.  You also heard from some of the
25              bank tellers that the defendant had a
                successful appeal from a constitutional error
26              and that the firearm counts were reversed for

                               23

1          retrial.

2          ...

3          MR. ARNETT: Well, this retrial is really all
           about whether the shotgun is a firearm under
4          the federal law.  The statute requires the
           government prove the offenses of bank
5          robbery.

6          To do this, the government contacted each of
           the tellers from the bank robberies and
7          invited them to attend two meetings prior to
           the trial for the express purpose of reviving
8          their memories of the events that happened on
           the dates of those robberies.  They did this
9          by having each one of them sit down in a
           small room and review the facts and prior
10         statements from the first trial and show them
           pictures of the events.

11
           And then again at this trial, the government
12         made the tellers once again relive those
           terrible memories.  And why did the
13         government do this?  They did it not just to
           prove an element of the offense, but to also
14         inflame your passion against me as a bad man.
           Their hope is that your feelings will
15         outweigh your consideration of the issue
           before you, whether the firearm is made in or
16         before 1898.

17         I simply ask that you don't hold their acts
           against me.  It's not my fault the bank
18         tellers had to relive these events.

19         In my taped statement, after I was arrested,
           you heard in detail how the defendant's life
20         had spiraled downward, out of control, how he
           did not want to commit these robberies.  How
21         he struggled to get the nerve to do them.
           How he never, ever could have hurt anyone and
22         how disgusted and ashamed of himself he was
           afterwards.

23
           Nevertheless, the charges in this case charge
24         a crime of violence.  And one of the elements
           of a crime of violence under this statute is
25         that a defendant had to commit a certain
           physical act.  And you heard each one - heard
26         me ask each individual teller the specific

                              24

1      questions over and over again.

2      For instance, did the robber actually touch,
       strike or inflict any bodily harm?  Did the
3      robber physically attempt to inflict any
       bodily harm?  Did the robber threaten to use
4      physical force against you?  Repeatedly you
       heard their answers.  This is an element that
5      has to be proven to get the enhanced penalty
       of crime of violence.

6

7      You also heard that when defendant took the
       car from one of the women, something he had
       never done before, and when she started to
8      hyperventilate, he tried to comfort her and
       explain that nothing was going to happen to
9      her.  And that after the car was used, he
       felt so bad about taking it and how she
10     reacted, that he returned the car back to the
       shopping center where it was taken so that
11     she could have her car back.  I would imagine
       that doesn't happen in too many cases like
12     this.  But it did.

13     Obviously taking this woman's car upset her
       very very much.  You also heard how her
14     reaction also affected the defendant.  And
       because of this, he never could take another
15     car from the presence of a person again.  You
       also heard him say that he could not stand
16     the person he had become.  How he wanted to
       confess to committing these crimes, serve his
17     punishment, and ultimately get back the life
       he had before all of this began as a building
18     contractor, father and responsible and
       respected member of the community.

19

20     Defendant is not expecting any sympathy nor
       does he deserve any.  Bank robbery is
       certainly a crime and a crime that he's
21     ashamed he committed ....

22     ...

23     MR. ARNETT: The statute at issue in this
       trial is an unusual statute in that it causes
24     you to tie a predicate offense to the
       underlying crime.  In this case the predicate
25     offenses are the bank robberies.

26     But this statute is really about whether the

                              25

1  |  defendant used a firearm during the
   |  commission of the bank robberies.  And that,
2  |  in essence, is what you, as jurors, are here
   |  today to decide whether I did.
3
   |  ...
4
   |  So I represent to you, ladies and gentlemen
5  |  of the jury, that this gun may be an antique.
   |  I don't know.  Mr. Wood wasn't about to get
6  |  up there and lie and tell you one thing that
   |  wasn't true.  He wasn't going to say, yes,
7  |  this is an antique.  Other people that
   |  testified up on that stand gave you a
8  |  specific year.  Mr. Wood didn't.  He told it
   |  just like it really is.  This gun could have
9  |  been made anywhere from 1888 all the way up
   |  to 1930.  And that's what I represent to you.
10 |  I don't know myself and nobody does.  And
   |  because of that, I ask you to find that I'm
11 |  not guilty because the gun is an antique
   |  firearm.  Thank you.
12
RT 847-851; 862.  The United States further refers to page 37 of
13
Arnett's Amended Objections to the Presentence Report (Doc. 565),
14
where, in the context of arguing for a downward adjustment for
15
acceptance of responsibility, Arnett states:
16
   |  In defendant's second trial before this Court
17 |  he did essentially the same thing, he only
   |  challenged the applicability of section
18 |  924(c)(1) to his conduct because his
   |  affirmative defense asserted that the firearm
19 |  was an antique firearm, and therefore outside
   |  the meaning of a firearm fro the purposes of
20 |  the statute.

21 The United States argues that the first California trial

22 transcript would not have been useful to Arnett in the second

23 California trial because that transcript was not relevant to his

24 defense.

25    The Supreme Court in *Britt v. North Carolina*, *supra*, 404

26 U.S. at 227, 229, stated in pertinent part:

26

In prior cases involving an indigent defendant's claim of right to a free transcript, this Court has identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. ....

...

... Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of a particular case ... [E]ven in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses.

But the court below did not use the language of 'particularized need.'  It rested the decision instead on the second factor in the determination of need, that is, the availability of adequate alternatives to a transcript.  The second trial was before the same judge, with the same counsel and the same court reporter, and the two trials were only a month apart.  In these circumstances, the court suggested that petitioner's memory and that of his counsel should have furnished an adequate substitute for a transcript.  In addition, the court pointed to the fact that petitioner could have called the court reporter to read to the jury the testimony given at the mistrial, in the event that inconsistent testimony was offered at the second trial.

We have repeatedly rejected the suggestion that in order to render effective assistance, counsel must have a perfect memory or keep exhaustive notes of the testimony given at trial.  Moreover, we doubt that it would suffice to provide the defendant with limited

27

1   access to the court reporter during the
    course of the second trial ... At oral
2   argument in this case, however, it emerged
    that petitioner could have obtained from the
3   court reporter far more assistance than that
    available to the ordinary defendant ... The
4   trials of this case took place in a small
    town where, according to petitioner's
5   counsel, the court reporter was a good friend
    of all the local lawyers and was reporting
6   the second trial.  It appears that the
    reporter would at any time have read back to
7   counsel his notes of the mistrial, well in
    advance of the second trial, if counsel had
8   simply made an informal request.

9   A defendant who claims the right to a free
    transcript does not, under our cases, bear
10  the burden of proving inadequate such
    alternatives as may be suggested by the State
11  or conjured up by a court in hindsight.  In
    this case, however, petitioner has conceded
12  that he had available an informal alternative
    which appears to be substantially equivalent
13  to a transcript.  Accordingly, we cannot
    conclude that the court below was in error in
14  rejecting his claim.

15   Arnett argued at the hearing on July 6, 2006, that the

16 absence of the transcripts of the prior trial prevented him from

17 presenting an effective defense during his cross-examination of

18 the victim tellers:

19          THE DEFENDANT: [¶] Now then you - just for
            one reason why I wanted the transcript was
20          that - and this is real clear, I think, in
            the record.  I was forced to bring in and
21          deal with - or have to deal with all of the
            bank tellers like I did and make it into a
22          full blown trial.  I didn't want to go there.
            The record is clear on that.  Rice didn't
23          want to go there.  I could have been a one or
            two day trial, just dealing with firearms
24          experts.  But he's going to bring in my
            redacted judgment of conviction, he's going
25          to bring in all these various facts.  And
            those kinds of facts prejudiced my right to
26          have a fair and impartial trial just on one

28

sole issue.  Was this gun an antique or not?
But no, we've got it into a full blown trial
so I was forced to have to deal with all
these victims, all these poor bank tellers.
And I felt for them.  That was horrible
experience to have to run back through that
after all these years.

THE COURT: There was a reason for that.

THE DEFENDANT: Right.  I was forced to deal
with this.  Now, these people at the first
trial, they just came in and they were real
meek and they just went through the process.
Well, one of the big issues that I've been
trying to attack, as a factual issue, and as
I have alleged as an element, is that the -
what is a crime of violence?  That the jury
has to determine that I physically used some
violence against these victims.  And so
that's why, when these people got up there on
the stand, I specifically addressed that
issue with each one of them.  I'm sure you
remember that.

THE COURT: I do remember it very clearly.

THE DEFENDANT: And I was forced to do this
because I - this is one avenue now that I
could possibly attack -

THE COURT: It's an element of the crime.

THE DEFENDANT: Right.

THE COURT: That's why it's relevant.

THE DEFENDANT: Right.

THE COURT: We can't ignore it.

THE DEFENDANT: And a jury issue.  These
facts.  Did I physically use any violence
against these people and so -

THE COURT: Well, it's a mixed question of
fact and law what a crime of violence is.

THE DEFENDANT: With all that in mind, if I
would have had the trial transcripts of their
prior testimony, I could have shown that all

1      of a sudden they're adding, they're
       supplementing and saying things that they
2      didn't say at the first trial.  There isn't
       anybody there at the first trial that said
3      oh, hey, you know, he used some physical
       violence, he stuck a gun to my head and said
4      that he was going to blow this person's
       brains out.  Or he was going to blow this
5      person's brains out.  That's ridiculous.
       That person just made that up at trial.  And
6      they never said that at the first trial.  And
       potentially if I would have had those
7      transcripts, I could have impeached that
       testimony.  You know, I admit here that I was
8      the bank robber, that I did those bank
       robberies.  But I did not threaten to kill
9      anybody.  I did not threaten to hurt anybody.
       I did not touch anybody with a gun or a
10     dangerous weapon or physically hurt anybody
       or do any physical violent act against any
11     single victim in any one of those bank
       robberies.  And it just irks me to no end to
12     be punished for a sentence of 140 years in
       prison for something I absolutely did not do.
13     And I feel real strong about that.

14         Arnett's contention that he could have impeached the victim

15  tellers' testimony at the second trial about his use of physical

16  violence against the victim tellers by referring to their

17  testimony at the first trial is a red herring.  Whether a

18  particular felony is a "crime of violence" with the meaning of

19  Section 924(c) is a question of law to be determined by the

20  court, not the jury, under the categorical analysis set forth in

21  *Taylor v. United States*, 495 U.S. 575 (1990).  *See United States*

22  *v. Amparo*, 68 F.3d 1222 (9th Cir.), *cert. denied*, 516 U.S. 1164

23  (1995); *see also United States v. Piccolo*, 441 F.3d 1084 (9th Cir.

24  2006).  18 U.S.C. § 924(c)(3)defines the term "crime of violence"

25  for purposes of Section 924 to mean an offense that is a felony

26  and

30

(A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Armed bank robbery is a crime of violence for purposes of Section 924(c) because one of the elements of the offense of armed bank robbery is a taking "by force and violence, or by intimidation." *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir.), *cert. denied*, 531 U.S. 969 (2000).  In *United States v. Selfa,* 918 F.2d 749 (9th Cir.), *cert. denied*, 498 U.S. 986 (1990, the defendant pleaded guilty to bank robbery and was sentenced as a career offender under U.S.S.G. § 4B1.1 based on two prior bank robbery convictions in violation of 18 U.S.C. § 2113(a).  On appeal, Selfa argued that since he was unarmed and he neither harmed nor threatened to harm anyone in any ay during the bank robberies, they were not crimes of violence and further argued that §4B1.1 did not support a per se rule that all robberies are crimes of violence.  In rejecting Selfa's appeal, the Ninth Circuit held in pertinent part:

Section 4B1.1 provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the incident offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) *the defendant has at least two prior felony convictions of* either *a crime of*

31

*violence* or a controlled substance
offense ....

U.S.S.G. § 4B1.1 at 4.11 (November 1, 1989)
ed.) ... The Application Notes to this
section state that '"crime of violence" ...
[is] defined in section 4B1.2.'  U.S.S.G. §
4B1.1 application note 1.  Section 4B1.2 in
turn provides in relevant part:

> The term 'crime of violence' means
> any offense under federal or state
> law punishable by imprisonment for
> a term exceeding one year that -
>
> (i) has an element of the use,
> attempted use, or threatened use of
> physical force against the person
> of another ....

U.S.S.G. § 4B1.2(1).  The Application Notes
to this section indicate that '"crime of
violence" includes ... robbery ....'
U.S.S.G. § 4B1.2 application note 2.

Selfa argues that since he was unarmed in the
two prior robberies, they were not crimes of
violence.  Section 4B1.2, however, does not
define a crime of violence as requiring the
use of a weapon.  He further contends that he
neither harmed nor threatened to harm anyone
in any way during the robberies, that none of
his victims suffered any long-term effects
from the robberies, and the section
4B1.2(1)(i) does not support a *per se* rule
that all robberies are crimes of violence.
He seeks a remand for an evidentiary hearing
to determine whether his past convictions
involved actual or threatened physical force.

...

We need not decide in this appeal ... whether
all robberies, regardless of the statute
under which they are punished, should be
considered *per se* crimes of violence.  Selfa
was twice convicted of violating that portion
of 18 U.S.C. § 2113(a) which requires, at the
very least, either 'force and violence' or
'intimidation.'  This court has defined
'intimidation' under section 2113(a) to mean

1    'wilfully to take, or attempt to take, in
     such a way that would put an ordinary,
2    reasonable person in fear of bodily harm.'
     *United States v. Hopkins*, 703 F.2d 1102, 1103
3    (9th Cir. 1983) ..., *cert. denied*, 464 U.S.
     963 ... (1983), definition is sufficient to
4    meet the section 4B1.2(1) requirement of a
     'threatened use of physical force.'   *See*
5    *United States v. Maddalena*, 893 F.2d 815, 819
     (6th Cir. 1989)('The requirement that property
6    be taken either "by force and violence" or
     "by intimidation" requires proof of force or
7    threat of force as an element of the
     offense.').
8
     We therefore hold that persons convicted of
9    robbing a bank 'by force and violence' or
     'intimidation under 18 U.S.C. § 2113(a) have
10   been convicted of a 'crime of violence'
     within the meaning of Guideline Section
11   4B1.1.  We conclude that the elements of the
     crimes of which the defendant was previously
12   convicted, and not the particular conduct of
     the defendant on the day the crimes were
13   committed, should control.  Further satellite
     factual hearings should not be required as a
14   matter of course in order to determine
     whether the defendant has previously been
15   convicted of crimes of violence.

16   918 F.2d at 751.  The fact that Arnett carried and in this case

17   used against each victim a sawed off shotgun which he exhibited

18   in a threatening manner during the bank robberies satisfies the

19   "crime of violence" element of Section 924(c).  That Arnett may

20   not have actually injured any of the bank tellers or or verbally

21   threatened to use the firearm against any of the bank tellers is

22   not consequential.  Any attempt to impeach the victim tellers'

23   testimony on this ground with testimony from the prior trial

24   would have been a meaningless exercise in view of the fact that

25   Arnett admitted in his closing argument and to some of the teller

26   witnesses that he was robbing them with a shotgun in plain view.

33

1    Nonetheless, denial of this motion for a new trial need not

2 be based on the absence of prejudice to Arnett.  As *Britt*

3 provides, the record is clear that Arnett had a copy of the

4 transcript of the first trial in his property at USP Victorville

5 and did not make any attempt to retrieve that copy or seek

6 assistance from the court or his court-appointed investigators to

7 do so when Mr. Rainwater did not deliver a copy.  Arnett never

8 advised the United States or the district court judges that Mr.

9 Rainwater had not given him the copy of the transcript.  Arnett

10 had alternative easily accessible sources or avenues to obtain a

11 copy and deliberately failed and refused to utilize them in an

12 attempt to manufacture error.[3]

13    For the reasons stated above:

14    1.  Arnett's motion for a new trial pursuant to Rule 33,

15 Federal Rules of Criminal Procedure, (Docs. 494-495) is DENIED.

16

17 SO ORDERED

18    Dated: _July 21___ , 2006

19                              _/s/ OLIVER W. WANGER_____
                                  OLIVER W. WANGER
20                             UNITED STATES DISTRICT JUDGE

21

22

23

24    [3]Arnett requests an evidentiary hearing to resolve whether he
   had a copy of the transcript of the first trial before the second
   trial.  An evidentiary hearing is unnecessary because it is assumed
25 for purposes of this Order that Arnett did not receive a copy of
   the transcript from Mr. Rainwater, contrary to Mr. Rainwater's
26 representations to Judge Coyle.

34